Gloria Morin Juarez, California State Bar No. 109115
**LAW OFFICES OF GLORIA JUAREZ**
28202 Cabot Road, Suite 300
Laguna Niguel, CA 92677
Tel: 949-288-3402
Email: gloria@thegjlaw.com
ATTORNEYS FOR RELATOR AMERICAN INTEGRA LLC

# COMPLAINT FILED UNDER SEAL PURSUANT
# TO 31 U.S.C. § 3730(b)(2)

UNITED STATES DISTRICT COURT
EASTERN  DISTRICT OF CALIFORNIA

Under Seal Plaintiff, *ex Rel.* under seal
    v.

Under Seal Defendants

Case No. _____

1  Gloria Morin Juarez, California State Bar No. 109115
2  **LAW OFFICES OF GLORIA JUAREZ**
3  28202 Cabot Road, Suite 300
   Laguna Niguel, CA 92677
4  Tel: 949-288-3042
   Email: gloria@thegjlaw.com
5  ATTORNEYS FOR RELATOR AMERICAN INTEGRA LLC

6           **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

7               UNITED STATES DISTRICT COURT
8              EASTERN  DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA and          Case No. _____
11  THE STATE OF CALIFORNIA, *ex. rel.*
    AMERICAN INTEGRA LLC                  **COMPLAINT FOR TREBLE DAMAGES**
12              Plaintiffs,               **AND  CIVIL PENALTIES FOR**
                                          **VIOLATION OF**
13      v.
                                          1.  **THE FEDERAL FALSE CLAIMS**
14  ELITE MEDICAL BILLING                     **ACT, 31 U.S.C. § 3279**
    CORPORATION;
15                                         2.  **THE CALIFORNIA FALSE CLAIMS**
    STERLING PATHOLOGY MEDICAL                **ACT, CAL. GOV. CODE §12650-12652**
16  CORPORATION, doing business as
    STERLING PATHOLOGY NATIONAL            3.  **ANTI-KICKBACK STATUTE, 42**
17  LABORATORIES, (also known as              **U.S.C. § 1320A-7B (B)**
    STERLING PATHOLOGY MEDICAL
18  GROUP);                                4.  **MAKING OR USING FALSE**
                                              **RECORD OR STATEMENT TO**
19  CHANGGAO YANG, M.D. (also known as        **CAUSE FALSE CLAIMS TO BE PAID**
20  CHANG GAO YANG, and CHENGGAO
    YANG);                                 5.  **CONSPIRACY TO VIOLATE THE**
21                                            **FEDERAL FALSE CLAIMS ACT**
    MICHAEL OKUNIEWSKI;
22                                         6.  **IMPROPERLY AVOIDING AN**
    ELLIE LEKOV, M.D. (also known as ELLIE    **OBLIGATION TO PAY OR**
23  SUVOUZ LEKOV, and ELI LEKOV);             **TRANSMIT MONEY TO THE**
                                              **GOVERNMENT**
24  JENNY CHANG, a.k.a JENNY AU;
25                                         7.  **UNJUST ENRICHMENT**
    and DOES 1-10,
26
             Defendants.
27                                         **DEMAND FOR JURY TRIAL**
28

# TABLE OF CONTENTS

I.      SUMMARY OF ACTION ................................................................. 4

II.     JURISDICTION AND VENUE ........................................................ 6

III.    PARTIES........................................................................................ 8

    A.    Plaintiffs ................................................................................... 8

    B.    Defendants ................................................................................ 8

    C.    Relator ..................................................................................... 10

IV.     COMMON FACTUAL ALLEGATIONS: BACKGROUND ..................... 10

    A.    Medicare and Medi-Cal........................................................... 10

    B.    Claims ..................................................................................... 11

    C.    Laboratory Testing ................................................................. 12

    D.    Local Carrier Determination .................................................. 13

    E.    Pathology Billing Codes ......................................................... 14

    F.    Pathology Limitations ............................................................ 15

    G.    Pathology Payments Slashed Nationally................................. 15

    H.    Pathology Fraud And Abuse ................................................... 16

V.      FACTS COMMON TO ALL COUNTS .............................................. 17

VI.     DEFENDANTS' FRAUDULENT ACTS .............................................. 21

    A.    Sterling Pathology .................................................................. 21

    B.    Elite Medical Billing Corporation .......................................... 23

    C.    Defendants Executed A Widely Known Special Stain Over-Billing Scheme.......... 26

    D.    Defendants Blatantly Violated Medicare Regulations ............. 26

    E.    Defendants' Knowingly And Intentionally Submitted False Claims...................... 27

    F.    Defendants Obtained Payment for Tests by Falsely Certifying the Rendering Doctor's Name and/or Signature, and  Medical Necessity. .............. 27

G.      Defendants Habitually Upcoded and Unbundled Special Stain Test Claims for
Unjust Enrichment...................................................................................... 30

H.      Defendants Affirmatively Modified Their Upcoding And Unbundling Practices To
Evade Government Detection. .................................................................... 31

I.      Defendants' Pass-Through Billing .............................................................. 32

**VII.    DEFENDANTS' EXEMPLAR FALSE HEALTHCARE CLAIMS ......................... 34**

A.      Patient 1 (E.M., age 76) .............................................................................. 34

A.      Patient 2 (J.J., age 68) ................................................................................. 34

B.      Patient 3 (W.M., age 89) ............................................................................. 35

C.      Patient 4 (M.B., age 73) .............................................................................. 35

D.      Patient 5 (S.B., age 61) ............................................................................... 35

**VIII.   LEGAL FRAMEWORK ............................................................................... 36**

A.      Violations of the Federal False Claims Act (FCA) ..................................... 36

B.      Violations of the California False Claims Act  (CFCA)............................... 39

C.      Violation  of the Federal Anti-Kick Back Statute (AKS) ........................... 42

**IX.     CLAIMS FOR RELIEF .............................................................................. 43**

**A.      FIRST CLAIM:   Federal False Claims Act ...................................... 43**

**B.      SECOND CLAIM : California False Claims Act ................................ 46**

**C.      THIRD CLAIM : Violation Of Anti-Kickback Statute.................................. 48**

**D.      FOURTH CLAIM :  Making Or Using False Record Or Statement ............ 56**

**E.      FIFTH CLAIM :   Conspiring To Submit Federal False Claims.................. 56**

**F.      SIXTH CLAIM :  Improperly Avoiding An Obligation To Pay Money ........ 59**

**G.      SEVENTH CLAIM: Unjust Enrichment.......................................... 59**

**PRAYER FOR RELIEF ..................................................................................... 60**

**COMPLAINT FOR DAMAGES**

1     Plaintiffs the United States of America (United States) and the State of California

2 (the "State"), by and through Relator American Integra LLC (Relator) and the

3 undersigned counsel, allege as follows:

**I.    SUMMARY**

4     1.    This action is brought against Defendants Sterling Pathology Medical

5 Corporation (Sterling) and Elite Medical Billing Corporation (Elite), who knowingly

6 engaged in unlawful laboratory billing practices and illicit marketing. These actions are in

7 violation of the False Claims Act (31 U.S.C. § 3729, et seq.) (FCA), the California False

8 Claims Act (Cal. Gov. Code §12652) (CFCA), and the Anti-Kickback Statute (42 U.S.C. §

9 l320a-7b(b)) (AKS). The suit is filed under seal on behalf the United States and the State of

10 California, pursuant to 31 U.S.C. § 3730.

11     2.    Defendants submitted false claims to Medicare, Medicaid, and the government

12 for unnecessary, unbundled, and upcoded Pathology special stains. They also engaged in

13 illicit COVID-19 test billing using unlawful contracted cappers, runners, and kickbacks to

14 obtain patients' insurance information and driver's licenses for unearned payments under

15 the COVID-19 CARES Act and the "HRSA COVID-19 Uninsured Program."

16     3.    These unlawful and false healthcare claims submitted by Defendants have led

17 to tens of millions of dollars in undeserved overpayments from the government,

18 undermining the integrity of our healthcare system and misappropriating taxpayer funds.

19     4.    Under Title XVIII of the Social Security Act, Section 1862(a)(1)(A), and Federal

20 Regulation 42 CFR § 410.32(a), Medicare, Medicaid, and TRICARE patients are entitled to

21 receive care necessary for their clinical needs, not for the financial gains of their healthcare

22 providers. These provisions, along with the FCA, CFCA, and AKS, hold healthcare providers

23 accountable if they bill for unnecessary services or treatment, manipulate billing through

24 unbundling and upcoding, or engage in illicit marketing practices.

25     5.    Defendants systematically exploited a well-known self-referral loophole in the

26 billing process for Pathology special stains for Medicare, Medicaid, and TRICARE

beneficiaries, in violation of the FCA and CFCA. They falsified physician names on final pathology reports and used unlicensed staff or medical providers not authorized to practice medicine in California. This manipulation allowed Defendants to generate millions in unearned revenues.

6. Defendants further exploited the COVID-19 pandemic by mass billing for COVID-19 testing, using illicit marketing and kickbacks. They leveraged lucrative loopholes and reimbursements in laboratory test payments under the CARES Act and HRSA COVID-19 Uninsured Program, accruing tens of millions of dollars in improper revenues through emergency government relief programs, in violation of the AKS.

7. Since at least 2012, Sterling and Elite have reaped profits from their false and predatory laboratory billing practices. They submitted countless false claims to the government for medically unnecessary "special stain" Pathology services and COVID-19 testing procured through unlawful use of cappers and runners, in violation of the FCA, CFCA, and AKS. Sterling's billing patterns and high frequency of certain codes reveal a reliable indication of fraud.

8. This case, under the FCA, CFCA, and AKS, seeks to hold Defendants accountable for their widespread laboratory testing fraud. Supported by exemplar Medicare patient records, Sterling-generated special stain reports, and Elite billing documents, the complaint demonstrates a pervasive and long-running scheme to defraud the government.

9. Defendants' deceitful practices, which included cloned test requisitions and reports, fabricated reports, pass-through billing, and kickbacks, targeted predominantly Medicare and Medicaid beneficiaries. Their recent COVID-19 testing schemes deliberately focused on certain immigrant communities — whom Defendants believed were culturally more cooperative and less likely to raise concerns about false claims.

10. Defendants' institutional "upcoding" and "unbundling" schemes violated the FCA and CFCA, targeted government beneficiaries, while providing kickbacks to third-party providers in exchange for large-scale milling and access to beneficiaries' driver's licenses and insurance information in violation of the AKS. The scheme resulted in

unearned COVID-19 CARES Act and HRSA COVID-19 Uninsured Program payments for testing which was never performed.

11.    Through their fraudulent business model, Sterling and Elite amassed astonishing revenues, undermining the trust and financial stability of government healthcare programs. Their actions not only violated multiple federal and state statutes, but also deprived vulnerable patients of much-needed healthcare resources.

12.    This case seeks to hold Defendants accountable for their unlawful actions and recover damages for the United States and the State of California. With the evidence gathered, including contracts between Sterling and its illicit marketing cappers, Plaintiffs aim to demonstrate the extent of Defendants' fraudulent practices and secure justice for the government and taxpayers.

13.    Damages in this case are estimated to be $35-40 million on an excess of 420,000 false claims. Additionally, Plaintiffs seek a civil penalty of $13,508 to $27,018 per federal false claim under the FCA, a civil penalty of $5,500 to $11,000 per state false claim under the CFCA, and treble (triple) damages as authorized by 31 U.S.C. § 3279.

## II.    <u>JURISDICTION AND VENUE</u>

14.    This Court has original *subject matter jurisdiction* pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, because this action is brought for violations of the False Claims Act pursuant to 31 U.S.C. § 3279, *a federal statute*. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims of the State.

15.    This Court also has *personal jurisdiction* over Defendants and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants can be found in, reside, and/or transact business in this District, and because fraudulent acts proscribed by 31 U.S.C. § 3729 occurred in this District.

16.    *Venue* is also proper pursuant to 28 U.S.C. § 1391(b) because one or more Defendants reside in this District, and because a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.  Specifically, *Defendants Elite*

*Medical Billing Corporation and Jenny Chang a.k.a. Jenny Au*, physically house and operate all the billing files for Defendants in Hanford, California which is located in **Kings** County, within the jurisdiction of the United States District Court for the **Eastern** District of California.

17.    This action is timely because it has been filed within the period prescribed by 31 U.S.C. §§ 373 l(b) and 3730(h)(3), and California False Claims Act, Cal. Gov. Code §12652.

18.    Relator concurrently served upon the Attorney General of the United States, the United States Attorney for the **Eastern** District of California, the Attorney General of the State of California, and the District Attorney's Office the original Complaint and a written disclosure summarizing the known material evidence and information in the possession of Relator, in accordance with the provisions of 31 U.S.C. § 3730(b)(2). The disclosure statement is supported by material evidence, and documentary evidence has been produced with the disclosure. Relator shall similarly serve a copy of any subsequent amended complaints to the government.

### Relator's Direct and Independent Knowledge

19.    Under 31 U.S.C. § 3730(e)(4)(A), there has been no statutorily relevant public disclosure of "substantially the same allegations or transactions" alleged in this Complaint. Relator makes the allegations in this Complaint based on its own knowledge, experience, and observations. Relator is the original source of the information on which the allegations herein are based, has direct and independent knowledge of such information, and has voluntarily disclosed such information to the United States and the State *before* filing this action.

20.    To the extent there has been any such public disclosure, Relator meets the definition of an "original source," as that term is defined under 31 U.S.C. § 3730(e)(4)(B). Specifically, Relator voluntarily disclosed to the Government the information upon which allegations or transactions at issue in this complaint are based prior to any purported public disclosure under 31 U.S.C. § 3730(e)(4)(A).

21.    Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided to the Government before filing this complaint. Relator therefore qualifies as an "original source" of the allegations in this Complaint such that the so-called public disclosure bar set forth at 31 U.S.C. § 3730(e)(4) even if invoked, would be inapplicable.

### III.    PARTIES

#### A.    Plaintiffs

22.    Plaintiff the UNITED STATES brings this action pursuant to 31 U.S.C. § 3279 by and through Relator. At all times relevant to this Complaint, the United States, acting through the Centers for Medicare & Medicaid Services ("CMS"), has reimbursed Defendants for the provision of various medical services and treatments for eligible individuals through the Medicare program. Thus, the United States brings this action on behalf of its agencies, CMS, Health and Human Services ("HHS"), and on behalf of the Medicare program.

23.    Plaintiff the STATE OF CALIFORNIA brings this action through the Relator pursuant to the California False Claims Act, Cal. Gov. Code §12652 which allows a relator to  bring a civil lawsuit for violations of this code on behalf of the State. The State has reimbursed Defendants for the provision of various medical services and treatments for eligible individuals through the Medicaid (Medi-Cal) program.

#### B.    Defendants

24.    Defendant STERLING PATHOLOGY MEDICAL CORPORATION, doing business as STERLING PATHOLOGY NATIONAL LABORATORY and also known as STERLING PATHOLOGY MEDICAL GROUP (collectively "Sterling"), is a for profit professional corporation organized and existing under the laws of the State of California, having its principal place of business in Seal Beach, California.

25.    Sterling provides "clinical medical laboratory" services *nationwide,* as credentialed in California, Florida, Maryland, New York, Rhode Island, and Pennsylvania. Sterling  bills the government for healthcare services under a number of aliases and

identifications including National Provider Identifier (NPI) **1174518302**, NPI 1467444893, NPI 1255324018, and Medicare No. HW16573, and MediCal No. A627810.

26.    Defendant CHANG GAO YANG, M.D., a.k.a CHANGGAO YANG AND CHENGGAO YANG (Yang) is an individual domiciled in California. Yang is the "Chief Executive Officer, Secretary, and Chief Financial Officer" of Sterling, and otherwise the corporate parent of, owns, or otherwise controls Sterling. Yang is licensed as a California physician License No. AG2281 and bills under **NPI 1366435638**.

27.    Defendant MICHAEL OKUNIEWSKI (Okuniewski) is an individual domiciled in California, who has been the managing Vice President of Operations and Sales, and the Chief Marketing Officer at Sterling since September 2011.

28.    Defendant ELLIE LEKOV, M.D. (Lekov) is an individual domiciled in California, and a managing agent and pathologist having her principal place of business at Sterling. She bills under **NPI 1033266788.**

29.    Defendant ELITE MEDICAL BILLING CORPORATION (Elite), a California Corporation Entity No. C3247563 located in Hanford, California, and JENNY CHANG (Chang), an individual (President and founder of Elite) are the principal and sole medical billers for Defendants and receive a sizable percentage of Sterling's earnings.

30.    At all times mentioned herein, each defendant was the agent for each other defendant, was acting in the course and scope of such agency and was engaged in a conspiracy to do the things herein alleged.

31.    Plaintiffs are informed and believe and, on that basis, allege that at all times relevant herein, Defendants, and each of them, were and remain the alter-egos of each other, that they did and still do dominate, influence and control each other, that there existed and still exists a unity of ownership between them, that the individuality and separateness of each entity was and remains non-existent, that each such entity was and remains a mere shell, conduit and/or naked framework which the other defendants used and still use to conduct their business affairs, and that each such entity was and remains inadequately capitalized, and that an injustice and fraud upon Plaintiffs will result if the theoretical

separateness of the defendant entities is not disregarded and each such defendant held liable for all relief being sought herein. Plaintiffs are informed and believe and on that basis alleges that at all times herein, Defendants, and each of them, knowingly and willfully conspired, joined and participated with each other in the conduct alleged in furtherance of a conspiracy between and among Defendants to enrich themselves at Plaintiffs' expense, and that each such defendant is therefore liable with each other defendant for the conduct herein alleged, for the damages suffered by Plaintiffs and for the relief being sought herein.

32. Plaintiffs are ignorant of the true names and capacities of the defendants sued herein under the fictitious names DOES 1 through 10. Each of the fictitiously named defendants is responsible in some manner for the acts and violations herein alleged. Plaintiffs will seek leave to amend this complaint to allege said defendants' true names and capacities as soon as Plaintiffs ascertain them.

**C.    Relator**

33. Relator AMERICAN INTEGRA LLC is a limited liability company registered and operating under the laws of New Mexico, bringing this action on behalf of itself, the United States, and the State as authorized by 31 U.S.C. § 3279 and Cal. Gov. Code § 12652.

34. Relator's original source knowledge of the matters giving rise to this action stems from Relator's business transactions with Defendants beginning in 2019 to 2023.

35. Relator's principal has engaged in business with Defendants Sterling, Okuniewski, Lekov, and Yang, and engaged in business and referral discussions with Defendants Elite and Chang. Relator has no current relationship with Defendants.

**IV.    COMMON FACTUAL ALLEGATIONS: BACKGROUND**

**A.    Medicare and Medi-Cal**

36. Medicare, a federally funded health insurance program, is administered by the U.S. Department of Health and Human Services (HHS) through its Center for Medicare and Medicaid Services (CMS). *See* 42 U.S.C. § 1395, *et seq.*

37.    Medicaid is a joint federal-state initiative that provides healthcare to low-income individuals. *See* 42 U.S.C. §§ 1396a(a)-(b). States develop and implement plans approved by HHS and CMS and pay providers according to established rates. The federal government then reimburses states based on a predetermined share of the total amount expended under the state plan. *See* 42 U.S.C. § 1396b(a)(1).

### B.    Government Claims

38.    Providers must obtain a provider number[1] to file claims for government reimbursement of services. By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

39.    The Medicare Enrollment Application form for Institutional Providers, CMS-855A, requires that an authorized official such as the chief executive officer execute a "Certification Statement" that "legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program." Through its authorized official, the Institutional Provider must also certify that:

- I have read and understand the Penalties for Falsifying Information . . . . I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . may be punished by criminal, civil or administrative penalties, including but not limited to the denial or revocation of Medicare billing privileges, and/or imposition of fines, civil damages, and/or imprisonment.

- I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

---

[1] Medicare maintains a unique National Provider Identifier (NPI) system, which assigns a unique, 10-digit numeric identifier to each institution, physician, non-physician practitioner, or medical group practice requesting or receiving payment for services provided to beneficiaries. NPI's are assigned to institutions as well as individual health care providers.

- I agree that any existing or future overpayment made to the provider by the Medicare program may be recouped by Medicare through the withholding of future payments.

- I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

40.    To bill Medicare for services provided to beneficiaries in California, providers submit a claim electronically (837P) or on Form CMS-1500 to Noridian, containing certain required information pertaining to the Medicare beneficiary.

41.    Claims must include essential information such as beneficiary's details, service description, billing CPT codes, date of service, the rendering provider's National Provider Identifier (NPI), the referring physician's NPI,  and a certification that the services were personally rendered by the provider and certifying that the contents of the form were true, correct, complete, that the form was prepared in compliance with all Medicare laws and regulations.

**C.    Laboratory Testing**

42.    42 CFR §410.32 outlines billing regulations for "…diagnostic laboratory tests, and other diagnostic tests."

43.    Section 410.32(a) provides, "…laboratory tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id*.

44.    If diagnostic testing is necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member, Medicare imposes additional requirements before covering the testing.

45.    Medicare only pays for medically necessary services that were provided as represented and prohibits claims procured through kickbacks or bribes. Medicare does not cover diagnostic testing, *including Pathology special stain testing,* that is not reasonable and necessary for diagnosis or treatment of illness or injury.

### D.     <u>Local Carrier Determination</u>

46.    CMS[2] outlines coverage for special stains under Local Coverage Determination (LCD) L36353[3]. LCD deems special stain testing medically necessary only in specific circumstances, namely, explained below, thereby imposing strict requirements for self-referral by the laboratory (Pathology doctor).

47.    This LCD allows for very limited special stains and imposes three express requirements if such a "self-referral" is made resulting in additional codes and charges by the lab "…there may be additional tests, such as special stains, that the pathologist may need to perform, even though they have not been specifically requested by the treating physician/practitioner. The pathologist may perform such additional tests under the following circumstances:

a)   Services are medically necessary so that a complete and accurate diagnosis can be reported to the treating physician/practitioner;

b)   Results of the tests are communicated to and are used by the treating physician/practitioner in the treatment of the beneficiary; and

c)   Pathologist documents in his/her report why additional testing was done."

48.    CMS expressly mandates that "The above citation means that reflex templates or pre-orders for special stains and/or IHC stains <u>prior to review</u> of the routine hematoxylin and eosin (H&E) stain by the pathologist are not reasonable and necessary. A pathologist must first review the H&E stain prior to ordering special stains or IHC."

49.    Medicare's LCD incorporates by reference "Title XVIII of the Social Security Act, Section 1862(a)(1)(A) states that no Medicare payment shall be made for items or services which are not reasonable and necessary for the diagnosis or treatment of illness or injury."

---

[2] The Medicare Administrative Contractor (MAC)  (MAC) for Jurisdiction E has granted limited coverage for special stain services under 42 U.S.C. 1395ff(f)(2)(B).

[3] LCD accessed on 4/11/2023 at https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdId=36353&ver=34.

### E.   **Pathology Billing Codes**

50.   Pathology services use a set of codes called Current Procedural Terminology (CPT) for billing purposes. These codes, ranging from 80002 to 89399, specify the procedures conducted, with surgical pathology services represented by codes 88300 to 88399.

51.   The complexity of the surgical pathology service is reflected in the codes used. For instance, simpler services use the CPT 88302 code, while highly complex ones use CPT 88307. However, pathologists most frequently use CPT codes 88304 or 88305.

52.   Routine Hematoxylin and Eosin (H&E) staining, a standard part of pathology services, is included in the billing codes from CPT 88300 to 88309. Therefore, additional charges for routine H&E staining are inappropriate and unwarranted.

53.   When cases are complex or results are unclear, pathologists may order additional special stains, represented by CPT codes 88312-88313 and 88341-88344. These special stains incur higher charges than standard pathology services.

54.   The Pathology section of the CPT codebook is quite straightforward, consisting of only four pages and listing 44 items. However, despite its brevity, every word and sentence in the procedure descriptors holds significant meaning.

55.   In this context, a "specimen" refers to tissue that requires individual examination and diagnosis. Multiple specimens from the same patient, such as separately identified endoscopic biopsies or skin lesions, each receive their own codes based on the level of service provided.

56.   The terms "unit of service" and "specimen" are fundamental to understanding CPT coding for surgical pathology. Each separately identified and diagnosed specimen corresponds to a unit of charge.

57.   A specimen is typically considered "submitted for individual and separate attention" when it arrives in the lab in a separately labeled container. However, this is not always the case — sometimes, tissues in separate containers must be combined as a single charge, based on specific rules from the American Medical Association (AMA) or the payer.

For a tissue sample to justify a charge, it must be individually diagnosed in the final diagnosis section of the medical report.

###### F.    Pathology Limitations

58.    According to Title XVIII of the Social Security Act §1833(e), Medicare payments are not allowed for claims lacking the necessary documentation or for services deemed unreasonable or unnecessary. Furthermore, Medicare Local Coverage Determinations (LCDs) prohibit healthcare payments for inappropriate or automatic/reflex ordering of special stains self-referred by pathologists.

59.    The typical billing practice in pathology is a "1 jar, 1 specimen, 1 CPT code" rule. However, some unethical laboratories may exploit a known loophole by reflexively billing or excessively using special stain codes to inflate revenue, thereby shifting to a "1 jar, 1 specimen, multiple CPT codes" approach, which can double or triple earnings per specimen.

60.    Special stains (coded as CPT 88312-88313, or 88341-88344) should only be used when standard H&E staining cannot provide all the necessary information, and the ordered special stain has a reasonable likelihood of contributing to or being relevant for the final diagnosis.

61.    Medicare payments for pathology are divided into technical (TC) and professional components (PC). Each component is billed separately, or the laboratory may bill globally for both the TC and PC if it performs both components.

###### G.    Pathology Payments Slashed Nationally

62.    In 2009, CMS introduced a single payment for multiple prostate saturation biopsy pathology services to address overpayment patterns, which effectively reduced earnings for reading prostate biopsies.

63.    In 2013, CMS further reduced all pathology reimbursements to tackle ongoing overbilling issues. This measure approximately halved reimbursement for the technical component (TC), leading to a 30% overall reduction in payment for a global pathology claim.

64.     CMS reduced reimbursement for immunohistochemistry special stains by over 30% in 2014 (following consistent increases the previous year). Despite these systematic reductions in pathology reimbursements, starting in 2016, claims and payments for immunohistochemistry submitted to Medicare began to rise again, necessitating further measures to ensure appropriate use and to combat overuse and abuse.

65.     Around 2011, reimbursements for surgical pathology CPT codes 88300-88399 were significantly reduced, by an average of one-third. This led to substantial revenue losses for pathology labs. For example, reimbursements for pathology code CPT 88305 fell from an average of roughly $200 to $78.65 per specimen by 2019 (source: https://www.palmettogba.com/palmetto/fees_front.nsf/fee_main?OpenForm).

66.     Shortly thereafter, both self-referred and non-self-referred special stain usage saw rapid increases, with self-referred special stains growing over 400% between 2004 and 2010. Self-referred special stains (from owner-operator laboratories) increased at a higher rate than non-self-referred special stains. Specifically, the number of self-referred special stains rose from about 60,000 in 2004 to about 340,000 in 2010—an increase of more than 400 percent.

### H.     Pathology Fraud And Abuse[4]

67.     When pathology codes 88304-88309 are billed routinely with special stain codes (CPT codes 88312-88313 and 88341-88344), they trigger a Medically Unlikely Edit (MUE), indicating potential billing fraud.

---

[4] The Government Accountability Office (GAO) published a general consensus report highlighting the increased use of anatomic pathology services by providers who self-refer, resulting in substantial additional healthcare and Medicare spending. See https://www.gao.gov/assets/660/655442.pdf The GAO report found that referrals for pathology services significantly increased after owner-operator labs began self-referring.

Medicare paid approximately $1.28 billion in 2010 under the physician fee schedule for pathology services across all settings, with nearly 80% ($945 million) performed in physician offices and independent laboratories, like Sterling. The GAO report also found that special stains, used with pathology services, accounted for about 66% of the $1.94 billion spent on these services in 2010, mainly for examining biopsy tissue samples.

68.     The "1 jar, 1 specimen, 1 CPT code" principle covers approximately 95-97% of coding situations. This principle balances aggressive unbundling of codes and cautious bundling.

69.     Routinely billing one special stain CPT code for every specimen or nearly every specimen (a practice seen in Sterling) is a clear example of billing fraud and abuse. Such a practice constitutes a "never" event - a flagrant upcoding and revenue scheme that goes beyond even the MUEs. This overt fraudulent activity fits within the statutory definitions of fraud under the False Claims Act (FCA) and the California False Claims Act (CFCA).

70.     Overbilling for "special stains" by owner-operator labs, such as Sterling, exploits a recognized loophole in the government's billing algorithm. This type of fraud and abuse is well-known and has led to several successful prosecutions and substantial monetary recoveries under the FCA.

## V.      FACTS COMMON TO ALL COUNTS

71.     Sterling, one of the most profitable Pathology laboratories in California *and* the United States, has consistently earned rank in the 99th percentile since at least January 9, 2013. Sterling is also at the 99th percentile compared to all other approximately 1000 pathologists in this State.

72.     While remarkable profits are not necessarily indicative of fraud, Sterling's are in substantial part the result of a course of conduct that includes unlawful "unbundling" and "upcoding" billing practices,  with reflexive ordering of special stains on nearly all specimens, even those not read by Sterling pathologists.

73.     Special stain fraud is a well-known, revenue-driven unlawful laboratory scheme used by providers like Sterling who have ownership positions in Pathology labs.

74.     Sterling's "self-referral" order rate for special stains was 100%-220%, compared to the approximate national standard of 5-10%. This resulted in systematically doubling and tripling Sterling's year-over-year earnings.

75.    Sterling routinely upcoded by improperly self-ordering, and habitually adding "special stain" CPT codes to routine Pathology CPT codes without meeting any of the requirements for government laboratory testing as outlined in   Title 42, CFR 410.32(a).

76.    In many instances, including for beneficiaries outlined in Section VII below, the special stain "Tests [were] not ordered by the physician who is treating the beneficiary," the reading pathologist, and were therefore "not reasonable and necessary." *Id.*

77.    Special stains are required in uncommon instances and must be reviewed by a pathologist before being ordered. Reflex or pre-ordering special stains, as done by Defendants, indicates premeditated and deliberate medical billing fraud.

78.    Defendants directed and required staff including administrative and clerical workers to pre-order and self-refer special stains for each specimen, resulting in double to triple revenues per specimen and circumventing the typical one specimen-one code rule in Pathology.

79.    Defendants' annual revenues were substantially enhanced by their  control over the number of inappropriate and self-ordered special stains at Sterling, instituting an unlawful business model of phantom requisitions, false Pathology reports,  and duplicitous pre-ordering, among other schemes.

80.    Reflex or pre-ordering special stains and/or ordering them for nearly every Pathology specimen (as done by *Sterling*), is all but a guarantee of premeditated and deliberate medical billing fraud.

81.    These institutional wide upcoding policies, knowingly devised by defendants, earned them sizable wealth while billing for Pathology slides,  special stains, and other tests that were either not created or examined but billed, or not ordered by a treating physician and billed to the government..

82.    The reading pathologist in most instances reads out the slide and report based on the H&E stain, but Sterling, Lekov and/or Yang then scrubbed the report and signed it themselves, always with an added-on special stain. As Such, Sterling in many cases as

shown in Section VII below, has no legitimate physician order for performing special stain tests, no signatory, and no records conforming with CFR §410.32.

83.    The rules require that the rendering pathologist must first review each routine H&E stain specimen before any special stain is ordered or billed. When performed in this manner, special stains are billed separately and additionally. The use of special stains before the analysis of the routine H&E-stained specimen is medically unnecessary and therefore not reimbursable.

84.    For every legitimate or actual surgical tissue specimen which Sterling received for routine Pathology, Sterling directed and required that the administrative staff or one of the pathologists pre-ordered and self-referred one or more special stains per tissue. Each improper special stain code then resulted in double to sometimes triple revenues per specimen in favor of Sterling. These unlawful billing practices are ongoing.

85.    Sterling's fraudulent billing practices and special stain schemes have persisted for over a decade, and are continuing- allowing Defendants including Sterling executives, pathologists, and billing managers to accumulate significant wealth.

86.    Defendants' disregard for medical necessity, correct billing, and reasonableness requirements contributed to a culture focused on maximizing revenues at the expense of lawful billing practices.

87.    The improper self-referrals, upcoding, and ordering of special stains, along with the lack of compliance with regulations, indicate a deliberate and systematic effort by Sterling and its co-conspirators to defraud the healthcare system for financial gain.

88.    The False Claims Act claim highlights Defendants' unlawful practices, emphasizing the need for accountability and proper oversight in the Pathology lab industry to prevent such fraudulent schemes from causing undue financial strain on the healthcare system.

89.    By exposing Sterling's fraudulent billing practices, the FCA claim seeks to put an end to Defendants' systematic abuse of the system and ensure that other Pathology labs

adhere to ethical and lawful practices for the benefit of patients, healthcare providers, and taxpayers.

90.    Even worse, at least 15-25% of Sterling's COVID-19 testing revenues in 2021 and 2022 were procured through billing the government for *phantom testing*- testing which was never done nor results ever made available or reported to beneficiaries.

91.    Sterling directly solicited Medicare and Medicaid beneficiaries to undergo its laboratory tests and agreed to not bill the beneficiaries for deductibles or co-pays in exchange for them undergoing any tests which Sterling ordered or billed. Sterling promised beneficiaries  that the tests were fully covered and "free." Defendants also paid cash kickbacks to cappers and runners, including foreign nationals and immigrants contracted by a California *fabric company* and others to induce referrals to federal healthcare programs for laboratory testing.

92.    Sterling mandates that its administrative staff reflex order special stains on all Pathology specimens for all beneficiaries, and that if any specimen is submitted for H&E Pathology, that a standing order for at least one special stain (and in some cases multiples) must be ordered per specimen received. In other instances, Sterling's administrative staff and transcriptionists are instructed to auto populate its reports with special stain verbiage, and cause charges to be billed to the government for special stains.

93.    If a physician orders or a patient submits to one H&E stain service at Sterling, Sterling institutionally mandates that it must self-order and bill Medicare, Medicaid, and carriers for at least one corresponding special stain code for each  H&E code, thereby doubling and often tripling Sterling's earnings per specimen.

## VI.    DEFENDANTS' FRAUDULENT ACTS

### A.    Sterling Pathology

94.    Defendant Changgao Yang, M.D. serves as Sterling's President, Chief Executive Officer (CEO), and "billing compliance officer" oversees contractor and employed pathologists[5].

95.    Sterling pathologists and Defendants Yang and Lekov rank in the 95th-100th percentile in three categories for total payment per pathologist, highest number of patients, and highest payments per patient statewide compared to the other approximately 1083 California pathologists.

96.    Defendant Yang holds NPI 1366435638. Yang's excessive special stain order rates far exceed national standards of 5-10%. Specifically and by way of example, in CY 2017, YANG's total Medicare production was as follows: 5798 units of CPT 88305, and total 12,756 units of "special stains". Accordingly, YANG's "special stain" order and bill rate in CY 2017 was approximately 220%.

97.    On analysis for 2017 CY, Defendant Yang billed Medicare approximately $8,724,888 in that year alone, an average from 1.3 to 9.6 "special stains" per beneficiary as set forth below and in the table-

    a)    Yang billed 2776 units of special stain CPT 88312 on 1573 patients, thus an average order rate of 1.8 stains per patient;

    b)    An additional 6736 units of special stain CPT 88313 on 2248 patients, thus an average order rate of 2.99 stains per patient.

    c)    An additional 1098 units of special stain CPT 88341 on 271 patients, thus an average order rate of 4.1 stains per patient; and

    d)    A further 2146 units of special stain CPT 88344 on 224 patients, thus an average order rate of 9.6 stains per patient for this code.

| CPT Codes | Number of Services | Number of Medicare Beneficiaries | Average Medicare Payment | Payments | **Special Stain Payments** |
|---|---|---|---|---|---|

---

[5] At relevant times, Sterling represented it employed six pathologists "Changgao Yang, M.D., PhD, Ellie Lekov, M.D., Kimberly Woodward, M.D., Paul F. Kirshman, M.D., William Ngoc Nguyen, M.D., and [Doctor 1] M.D."

| | | | | | |
|---|---|---|---|---|---|
| 88305 | 5,798 | 2,385 | $124.50 | $296,933 | |
| **88312** | 2,776 | 1,573 | $148.20 | $233,120 | $233,120 |
| **88313** | 6,736 | 2,248 | $185.96 | $418,032 | $418,032 |
| **88341** | 1,098 | 271 | $334.56 | $90,667 | $90,667 |
| **88342** | 528 | 416 | $119.24 | $49,603 | $49,603 |
| **88344** | 2,146 | 224 | $1531.60 | $343,078 | $343,078 |
| **Total CMS Payments** | | | | | **$1,134,500** |

98. Defendant Lekov holds NPI 1033266788. Lekov's excessive special stain order rates far exceed national standards of 5-10%. In CY 2017, Lekov's Medicare production was as follows: 2550 units of CPT 88305 for total specimens billed, and 4482 units of "special stains[6]". Accordingly, Dr. Lekov's "special stain" order and bill rate in CY 2017 was 172%, well above the national benchmark.

99.    Sterling pathologists Yang and Lekov received more than 50% and 62% of their total Medicare revenues from special stains, respectively, compared to a non-Sterling pathologist's 2.1%[7].

| Pathologist | NPI | | | % of total Medicare revenues from special stain CPTs |
|---|---|---|---|---|
| Doctor 1 | 1932145133 | | | 2.1% |
| Defendant LEKOV | 1033266788 | | | 62% |
| Defendant YANG | 1366435638 | | | 50% |

100.   Sterling pathologists Yang and Lekov processed *fewer* specimens in 2013, but increased revenues through special stain upcoding, earning significantly more per patient and per-specimen than non-Sterling pathologists.

---

[6] "Special Stains" CPT include codes 88312- 88313, and 88341- 88344.
[7] In comparison, in CY 2017 Dr. P.S. (a non-Sterling pathologist) with NPI 1932145133 (practicing in the same geographic area as Defendants) received 2.1% of his total Medicare revenues from "special stains".

101. Despite CMS's national reduction of Pathology reimbursement by 30% effective January 1, 2013, Yang's upcoding scheme resulted in $716 payment per patient in 2013, up from $537 in 2012, and an additional $308,000 in Medicare revenues, despite also having *fewer* specimens.

102. In contrast to non-Sterling pathologists operating within CMS's reduced Pathology allowances amounts, Sterling (Yang) billed and received on average 300%-500% more per patient from CMS during the same period.

103. In comparison to Yang's earnings of $537-$716 per patient as a result of upcoding with inappropriate special stain codes, an average non-Sterling pathologist in the same region earned only $75-105 per patient during the same time period.

**B.    Elite Medical Billing Corporation**

104. Defendants Elite Medical Billing Corporation and Jenny Chang perform all of Sterling's coding, billing, collections, and appeals, in an ongoing relationship that facilitates Sterling's illicit practices. Elite and Chang processed Sterling's unlawful claims, securing a portion of the profits from fraudulent special stain upcoding and COVID-19 testing.

105. Granted direct access to Sterling's electronic medical records and billing data, Elite and Chang were able to review, audit, correct, appeal, and generate detailed reports on Sterling's billing practices. This included systematic upcoding, unbundling, and excessive use of special stain codes.

106. In 2022, Elite and Chang created and submitted approximately 200,000 new government claims for COVID-19 testing on behalf of Sterling, thereby securing payments from the CARES Act and HRSA COVID-19 Uninsured Program. To manage the surge in volume, Chang expanded Elite's operations by recruiting overseas billers.

107. Elite and Chang profited from Sterling's gross earnings based on an agreement that allotted them a portion of the gross collections. They supplied Sterling with the necessary coding, billing infrastructure, logistics, and staff, thus enabling Sterling's fraudulent billing practices.

108. Upon information and belief, communications, and directives between Sterling, Okuniewski, Yang, Lekov and Elite's ownership management under Chang required that all Pathology claims be scrubbed by Elite and Chang to add-on billing for at least one special stain code for each H&E code billed per specimen. This ensured no pathology claim was submitted without unbundling and upcoding.

109. Communications and directives between Sterling, Okuniewski, Yang, Lekov, and Elite's management under Chang indicated that all pathology claims should include at least one special stain code for each H&E code billed per specimen.

110. Despite their awareness of Sterling's fraudulent practices, Elite and Chang willingly participated in the fraud, processing false claims and upcoded entries, and transmitting fraudulent codes and claims for government payment. In return, they retained 5-6% of the gross collections from Sterling's unlawful billing.

111. Elite and Chang's close collaboration with Sterling enabled fraudulent billing, with both parties profiting from the increased revenues. From 2020 to 2023, they conspired to process false and fraudulent COVID-19 testing claims to the government, which did not meet the regulations for those services. Sterling, remaining Elite's primary and most profitable client, led to a substantial volume and earnings surge due to the CARES Act.

112. As Chang explained it on or about April 4, 2023, Sterling remains her and Elite's "number 1" (and most profitable) client: "we were part of the CARES Act" so "our [2021 and 2022] volumes were through the roof."

113. For their pivotal role in facilitating Sterling's fraudulent billing, Elite and Chang received remuneration exceeding the scope of their "billing services". By merging their systems with Sterling's, they cemented their complicity in Sterling's fraudulent billing practices, receiving a percentage of the gross revenues and disproportionate "perks".

114. Elite and Chang's deep involvement in Sterling's operations allowed them a comprehensive insight into Sterling's patient database, pathology records, and medical requisitions. Their unrestricted, remote access into Sterling's complete data facilitated the perpetuation of fraudulent billing practices.

115. Despite being a medical billing company with an obligation to uphold lawful practices, Elite and Chang were complacent about Sterling's fraudulent addition of a special stain code to every H&E stain. Their remuneration was not in line with the standard "billing services" they purported to provide, indicating their complicity in Sterling's fraudulent practices.

116. By turning a blind eye to the fraudulent practices and facilitating the submission of false claims, Elite and Chang became key enablers in Sterling's unlawful operations. Their direct involvement and profiteering from Sterling's illicit gains underscore their active participation in the fraud.

117. All the fraudulent actions of Elite and Chang were carried out under the knowledge and directives of Sterling, Okuniewski, Yang, and Lekov. This high-level conspiracy was critical in maintaining Sterling's unlawful operations and resulted in significant financial damage to the government's Medicare, Medicaid, and Tricare programs.

118. In summary, Elite and Chang were instrumental in facilitating and perpetuating Sterling's fraudulent practices. Their direct involvement, extensive access to Sterling's data, active participation in submitting false claims, and disproportionate remuneration highlight their complicity in Sterling's systematic defrauding of government healthcare programs.

119. The relationship between Elite, Chang, and Sterling was not just a service provider-client relationship; it was a partnership in unlawful activities. The considerable access Elite and Chang had to Sterling's data, their willingness to turn a blind eye to fraudulent practices, and their direct involvement in the fraudulent scheme.

120. Elite and Chang were not mere bystanders in Sterling's fraud against the government. They were active participants who benefited financially from their involvement. By processing, billing, and posting deposits for Sterling's unlawful claims, they directly profited from the fraud, collecting a percentage of the illicit gains.

121. Elite and Chang's involvement in this long running billing scheme was not incidental and went beyond mere negligence or ignorance; it was intentional and calculated to maximize their own financial gain at the expense of the government.

## C.     Defendants Executed A Widely Known Special Stain Over-Billing Scheme

122. Defendants' excessive profits originated from a carefully devised and intentional fraudulent course of action, encompassing unlawful upcoding and unbundling practices, as well as the employment of runners and cappers.

123. Sterling's lead executives, including CEO Yang and VP Okuniewski, devised, implemented, and enforced aggressive and illicit upcoding which focused on unlawful special stain codes, and they overlooked compliance issues and cultivated a profit-centric environment within the organization.

124. Sterling's illicit billing practices can be traced back to at least 2012, aligning with the arrival of VP and "marketing director" Okuniewski, who was instrumental in implementing Defendants' scheme to increase earnings despite decreasing patient numbers.

125. Sterling's fraudulent conduct was partially a reaction to CMS's significant reductions in standard Pathology CPT code payments in 2009 and 2013, prompting Sterling to inappropriately upcode and take advantage of add-on special stain codes to manipulate its earnings.

## D.     Defendants Blatantly Violated Medicare Regulations.

126. Sterling, reliant on referring physicians and healthcare providers for submitting specimens for testing, encountered obstacles due to significant reductions in the CMS Pathology fee schedule. To counterbalance these financial challenges, Sterling employed self-referral schemes, characterized by a substantial overutilization of special stains.

127. Defendants systematically engaged in reflexive and pre-ordering of numerous special stain codes for virtually every patient specimen submitted for Pathology services. They executed this without fulfilling the criteria of medical necessity, treating doctor's orders, and Medicare LCDs. Furthermore, Defendants reflex ordered special stains before

pathologists had the opportunity to examine the H&E slide and neglected to accurately document the need for these deceptively ordered special stains.

### E.    Defendants' Knowingly Submitted False Claims.

128.    Defendant Okuniewski represented to Relator's principal that Sterling always has two pathologists review and read each slide but represented that they only bill the government or carriers for one doctor, not two.

129.    Okuniewski admitted to Relator's principal and concurred that special stains should be ordered less than 10% of the time at sterling. On or about February 10, 2020 Okuniewski then misrepresented to Relator's principal that Sterling's special stain rate did not exceed 10%, which it did- in order to retain Relator's principal's account.

130.    When confronted with Sterling's overutilization of special stains and billing for Patients 1 ,2, 3, and 4 in Section VII below, Okuniewski misrepresented that Sterling only ordered special stains in 10% of cases,  and that special stains were not billed for each of these patients (which they were.)

131.    Defendants' employees and staff were instructed to bill the government for unlawful special stains. Defendants' mandates included expressly using "generic" physician names (whom had no direct role with the services rendered)  in on the Pathology report and outside Pathology consult requisition forms.

132.    Defendants thus caused the submission of false claims to the government for special stains for each patient, and they knew that their practice of billing for special stains on every specimen or nearly every specimen was fraudulent.

133.    Defendants told their employees to electronically transmit or mail false claims to the government for payment on countless Pathology and laboratory claims which Defendants knew violated the FCA and CFCA.

### F.    Defendants Obtained Payment for Tests by Falsely Certifying the Rendering Doctor's Name and/or Signature, and  Medical Necessity.

134.    The Social Security Act (SSA) provides: "no payment may be made under Part A or Part B [of Medicare] for any expenses incurred for items or services which ... are not reasonable and necessary " 42 U.S.C. 1395(a)( I )(A). The SSA defines "certificate of medical

necessity" as · a form or other document containing information required by the carrier to be submitted to show that an item is reasonable and necessary" (42 U.S.C. 1395(2)(B).)

135.  The SSA prohibits payments for items or services that are not reasonable and necessary. Medical necessity certificates must contain information required by the carrier to show that an item is reasonable and necessary.

136.  Defendants submitted claims for payment relying on fraudulent medical necessity certificates, generic physician names, and fictitious ordering physicians. This large-scale fraud resulted in the defendants retaining millions of dollars in unearned payments.

137.  Defendants directed managing agents and administrative staff to pre-sign blank medical necessity certificates, using these templates to create fraudulent certificates without the reading pathologist or treating physician's actual approval. In some instances, the medical transcription service was instructed to create false report templates, which automatically added a negative special stain result to all Sterling reports.

138.  Defendants ordered and conducted tests without physicians' orders or medical necessity, defrauding Medicare and the State on a massive scale and retaining tens of millions of dollars in unearned payments.

139.  Defendants also received denials and record requests on some of their improper and duplicate claims. They presented false records for government payments and deflected billing inquiries and complaints from confused beneficiaries questioning double Pathology charges.

140.  To procure their fraud, Defendants instructed managing agents, including Lekov and administrative staff, to reflexively pre-sign blank certificates of medical necessity. Defendants used these "templates" to create fraudulent certificates of medical necessity for their claims, without the treating physician or reading pathologist actually signing off on the specific special stain test underlying the claim.

141. Sterling, Yang, and Lekov's known practice of assigning "generic" doctor's names on Pathology reports and requisitions reflects a failure to comply with Medicare and

Medicaid rules which require accurate identification of the rendering provider by name and NPI.

142.   Furthermore, Defendants ordered and conducted tests for which there were no physicians' orders or medical necessity. Defendants have perpetrated this fraud on a massive scale and have received many tens of millions of dollars in undeserved payments from both Medicare and the State.

**Doctor 1**

143.   In Section VII below, Doctor 1 the reading pathologist, did not order the special stains added by Sterling for the Medicare beneficiaries. Sterling had no authority to order the special stains, as that authority belonged to Doctor 1.

144.   Doctor 1 is an independent contractor who explains he reads on average 2-3 slides for Sterling per month. As a non-employed pathologist, Doctor 1 has not been to Sterling's premises since 2008 or 2009, when he visited once when he began his relationship with Sterling. Sterling ships out slides monthly to Doctor 1 who reads (interprets) Sterling's slides at his own company premises in another city and issues a formal Pathology report.

145.   Sterling pays Doctor 1 per slide on an end-of-month invoicing. Sterling suppresses Doctor 1's Pathology report, issues its own report, and adds and bills a special stain code and service which was neither ordered by Doctor 1 nor performed or read out by him.

146.   Sterling does not disclose that it bills for special stains on the slides read by Doctor 1 which neither required a special stain for the final diagnosis, nor did Doctor 1 order a special stain.

147.   Sterling's practice of suppressing Doctor 1's  Pathology report, issuing its own report, and adding special stain codes and services without Doctor 1's  authorization or medical necessity constitutes fraud against Medicare and Medicaid.

148.   Doctor 1 neither requested the special stain services which were billed by Sterling, Yang, and Lekov, nor authorized the special stains, nor billed the government for reading these special stains. Doctor 1's Medicare records reflect his annual special stain

order and bill rate year-over-year is approximately 2.1%, a hundredfold less than Defendant Yang's special stain order rate.

149.    Doctor 1, the reading pathologist on Sterling's reports, never ordered the special stains, and Sterling added the special stain code after Doctor 1 read the slides and had rendered his final diagnosis. Not only was there no medical necessity for the special stain Sterling billed, but there was also an absence of a treating physician order for it. Sterling did not have any authority to even order the special stains because Doctor 1 held that authority as the reading pathologist.

**Doctor 2**

150.    Similarly, Doctor 2, the reading pathologist, did not authorize the special stains added by Sterling for patients, including Patient 5 discussed in Section VII below. Sterling had no authority to order the FIVE special stains for Patient 5; that authority lay exclusively with Doctor 2, the rendering and reading pathologist. Medicare does not reimburse for tests unless they are ordered by the treating physician or the rendering provider. As neither the patient's treating doctor nor Doctor 2 ordered these special stains, and given that these were reflexive and cloned special stain orders directed by business imperatives from Defendants Sterling, Yang, Lekov, Okuniewski., Elite, and Chang, each of these FIVE special stains constitutes a separate false claim.

**G.    Defendants Habitually Upcoded and Unbundled Special Stain Test Claims for Unjust Enrichment**

151.    Sterling upcoded, unbundled, billed, and received and retained payments from the government for test claims which did not conform to NCCI, violated the LCDs for special stains, were not ordered by the treating physician, were medically unnecessary, were in some instances incompatible special stain code and diagnosis combinations, and failed to adhere to CMS mandates for countless beneficiaries including Patients 1,2, 3, 4, and 5 as outlined in Section VII below.

152.    Defendants conspired to violate the FCA and the CFCA by causing the submission of false or fraudulent claims; conspired to make and use, or cause to be made or

used, false records material to false or fraudulent claims; and once put on notice of the unlawful billing, conspired to not disclose, or return the resulting overpayments to the government.

153.   By consistently and knowingly adding special stains without medical necessity or physician orders, Defendants Sterling, Yang, and Lekov have defrauded Medicare and the State, collecting tens of millions of dollars in undeserved payments.

154.   Defendants' fraudulent practices have not only caused financial harm to the government but have also jeopardized the health and wellbeing of patients by providing them with potentially unnecessary and misleading diagnostic information.

155.   The fraudulent actions of Defendants Sterling, Yang, Lekov, and their managing agents, including Okuniewski, have violated the FCA, CFCA, and AK and caused substantial harm to the United States government and the State, as well as to the Medicare and Medicaid programs, and their beneficiaries.

156.   In light of the substantial fraud perpetrated by Defendants and the harm caused to the government and its beneficiaries, Defendants must be held fully accountable for their unlawful actions and to recover the ill-gotten gains obtained through their fraudulent practices.

157.   The practices complained of herein are continuing, resulting in the submission of additional false or fraudulent claims.

**H.    Defendants Affirmatively Modified Their Upcoding And Unbundling Practices To Evade Government Detection.**

158.   On or about January 1, 2020, Defendants Sterling, Yang, Lekov, Okuniewski, and Does 1-10 modified their companywide upcoding and unbundling mandates and policies to add certain verbiage to their Pathology reports as follows "Initial H&E reviewed. Special stains are performed and reviewed when indicated, with appropriate negative and positive controls." Although sterling did not change its company mandate to unlawfully upcode each specimen with a minimum of one special stain, it added the language intended to evade repayment demands.

159. Sterling's described policy change is evident when analyzing Sterling's 2017 Pathology reports compared to its 2020 reports. However, regardless of Sterling's amended documentation, every patient's specimen was reflexively required to be pre-ordered and billed for a special stain, regardless of lack of medical necessity or the lack of an authorized physician order for the special stain. Hence, Sterling continues to unlawfully and with knowing intent upcode and bundle Pathology specimens with at least one special stain code per specimen.

**I.    Defendants Billed For COVID-19 Testing Which Was Never Performed.**

160. Sterling claimed a capacity for performing "33,000" COVID tests per week, all compensated by Medicare, Medicaid, or the government through the CARES Act and the HRSA COVID-19 Uninsured Program. The government requires that for the laboratory service to be deemed reimbursable, testing results must be made available to the treating provider, or in some cases directly to the patient.

161. During 2021 and 2022, Sterling collected more COVID-19 samples than they could test due to their illicit marketing and recruitment practices. Despite lacking the resources required to timely or adequately process these specimens, Sterling failed to halt sample collection. Consequently, Sterling was unable to process numerous specimens and failed to provide results, despite billing the government for all collected samples, regardless of whether they were tested.

**J.    Defendants Engaged In  Pass-Through Billing.**

162. Sterling utilized pass-through billing, contracting with external laboratories and pathology corporations to perform medical testing services, yet billed Medicare and Medicaid as if the tests were conducted in-house. This misleading practice allowed Sterling to charge inflated prices for the tests, thereby profiting from the unwarranted markup.

163. Defendants unethically billed the government globally for services performed by external labs, including *Neogenomics Laboratories Inc.,* at marked-up prices, in violation of regulations.

164.   Medicare mandates that any service attached to a line-item CPT 90 modifier must disclose the provider's information. Defendants neglected to adhere to government regulations in their billing practices, including failing to correctly identify the reading pathologist's NPI and neglecting to attach a modifier 90 on healthcare lab claims. Defendants inappropriately used external labs and pathologists without appropriate disclosure or billing adjustments.

165.   From at least 2008, Defendants systematically contracted with independent pathologists (such as Doctor 1 and Doctor 2), physically sending glass slides to pathologists located away from Sterling's premises for pathology report generation.

166.   Despite the fact that contractors did not read the slides at Sterling's premises in Seal Beach, Sterling failed to accurately reflect the place of service on its claims to the government. Sterling misrepresented the services rendered by omitting correct modifiers and other claims information.

167.   Sterling also neglected to comply with Correct Coding Initiatives (CCI), which mandate the addition of a -90 modifier to identify services performed by a party other than the reporting physician.

168.   Further, Sterling concealed the external pathologists' report from the medical record but used the external pathologist's name on Sterling's final Pathology report, falsely implying that Sterling provided the services.

169.   Sterling subsequently billed the government under their own doctors' names for services they did not provide. Sterling's alleged "ordering doctor" for most of its special stains was illusory, as the "generic" named pathologist on some reports never read the Pathology slide upon which Sterling billed for its special stain.

170.   By misrepresenting the true provider of the services and neglecting to properly apply required billing modifiers, Sterling violated applicable laws and regulations, including the Stark Law and the Anti-Kickback Statute, which aim to prevent fraud and abuse in the healthcare system.

## VII.    DEFENDANTS' EXEMPLAR FALSE HEALTHCARE CLAIMS

171.    Defendants submitted o false claims and received and retained payments for upcoded and unbundled special stain codes for Medicare and Medicaid beneficiaries. The following examples detail Defendants' fraudulent billing practices for five patients, involving unnecessary special stains, upcoding, and unbundling charges:

### A.    Patient 1 (E.M., age 76)

172.    Defendants Sterling, Elite, Chang, and Dr. Lekov billed unnecessary special stain services for Patient 1, which were read by an outside contracted dermatopathologist, Doctor 1. No medical necessity or treating physician's request was present for the special stain. The special stain was marked as negative "(ct/mw)." The claim was submitted on February 6, 2020, and payment was obtained from the government, hence a false claim.

173.    Sterling's report reflects the actual service was performed (read out) by an outside (contracted) pathologist Doctor 1, however Dr. Lekov signed and issued the final Pathology report which ADDED a special stain service, which resulted in improper unbundling and upcoding, including CPT code 88305 for a standard H&E stain and an additional CPT code 88312 for a special stain.

174.    There was no medical necessity for the special stain as Doctor 1 made his final diagnosis based on the routine H&E stain. There was also no order or request by Doctor 1 for a special stain or any comment requiring further testing.

175.    Patient 1's treating physician did not request or order the unnecessary special stain service and charge, which Sterling and Lekov reflex added solely pursuant to Defendants' billing mandates.

### A.    Patient 2 (J.J., age 68)

176.    Similarly, Defendants and Dr. Lekov billed unnecessary special stain services for Patient 2, which were read by dermatopathologist Doctor 1. No medical necessity or treating physician's request was present for the special stain. The special stain was marked as negative "(ct/mw)." The Pathology report shows that the additional service was

unnecessary and not medically justified. The special stain claim was submitted on February 6, 2020, and payment was obtained from the government, hence a false claim.

### B.  Patient 3 (W.M., age 89)

177.  Likewise, Defendants and Dr. Lekov upcoded and billed unnecessary special stain services for Patient 3, which were read by dermatopathologist Doctor 1. No medical necessity or treating physician's request was present for the special stain. The Pathology report reflects the special stain was negative and marked as "(ct/mw)." The claim was submitted on February 6, 2020, and payment was obtained from the government, hence a false claim.

### C.  Patient 4 (M.B., age 73)

178.  Defendants and Dr. Lekov upcoded and billed unnecessary special stains for Patient 4, which were read by Doctor 1. They submitted two false claims for special stains. Both special stains were marked as negative, with no medical necessity or treating physician's request for either stain. The special stain claims were submitted in 2020, and payments were obtained from the government, hence two false claims.

### D.  Patient 5 (S.B., age 61)

179.  Defendants and Dr. Yang upcoded and billed five false and unnecessary special stain services for Patient 5, which were read by Doctor 2. All five special stains were marked as negative "(nh/es)" with no medical necessity or treating physician's request. Sterling could not produce any special stain slides for this patient, as they likely never existed. Five special stain claims were submitted for payment on April 6, 2017, and payment was obtained for this claim- hence five false claims.

180.  There was no indication of medical necessity for the reflex special stains because Doctor 2 made her final diagnosis on the routine H&E stain.

181.  There was also no order or request by the reading pathologist Doctor 2 for a special stain on either of these FIVE specimens, or any comment in her reading which required a special stain on any of the FIVE specimens. Further, there was no clinical

information or request by Patient 5's treating provider that either expressly requested or ordered the special stains.

182.    Neither Sterling nor its representatives could produce any of the "special stain" slides for Patient 5 despite multiple demands for them to produce the slides, raising questions about their existence. This lack of evidence suggests that the slides might have never existed in the first place, further implicating Sterling and its representatives in fraudulent billing practices.

# VIII.    LEGAL FRAMEWORK

## A.    Violations of the Federal False Claims Act (FCA)

183.    This claim for violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, is brought by the Relator in the name of the United States, pursuant to 31 U.S.C. § 3730(b). Relator is an "original source" of the information on which this claim is based, as that term is defined in 31 U.S.C. § 3730(e)(4)(B).

184.    31 U.S.C. § 3729(a)(1)(A) provides that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person.

185.    31 U.S.C. § 3729(b)(1) defines "knowingly" to "mean that a person, with respect to information – (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require[s] no proof of specific intent to defraud."

186.    In relevant part, 31 U.S.C. § 3729(b)(2) defines "claim" as:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—
>
> > (i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

187. The Medicare claims submitted by Defendants to CMS and/or its Medicare Administrative Contractors are "claims" within the meaning of the FCA.

188. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by regularly and freely unbundling and separately charging for **Pathology special stains** and procedures that were part of a global fee schedule, and thus not eligible for separate billing, in violation of 31 U.S.C. § 3729(a)(1)(A).

189. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval for innumerable **special stain codes** which were not performed as such, in violation of 31 U.S.C. § 3729(a)(1)(A).

190. 31 U.S.C. § 3729(a)(1)(B) provides that any person who:

knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person.

191. 31 U.S.C. § 3729(b)(4) defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."

192. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements material to the foregoing false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendants

knowingly submitted false or fraudulent claims using false CPT billing codes, which not only influenced, but determined, the amount they were paid.

193.  The United States, unaware of the falsity or fraudulence of the claims presented by Defendants, or the falsity of the records and/or statements which the Defendants made,  used, or caused doctors and other health care providers to make, and in reliance on the accuracy thereof, paid Defendants, doctors, and other health care providers for claims that would otherwise not have been allowed, suffering damages.

194.  31 U.S.C. § 3729(a)(1)(G) provides that any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money to the Government . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person.

195.  31 U.S.C. § 3729(b)(4) defines "obligation" to include "an established duty, whether or not fixed, arising from an express or implied contractual . . . relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]"

196.  By virtue of the acts described above, Defendants knowingly concealed and/or knowingly and improperly avoided an obligation to pay or transmit money to the Government resulting from Defendants' retention of the foregoing overpayments, in violation of 31 U.S.C. § 3729(a)(1)(G).

197.  As a result of the above-described conduct, the United States is entitled to civil penalties and treble damages as provided by 31 U.S.C. § 3729(a)(1).

198.  31 U.S.C. § 3729(a)(1)(C) provides that any person who "conspires to commit" any of the foregoing violations is liable for the same civil penalties and treble damages. Defendants conspired to commit each the violations alleged, for which they are jointly and severally liable.

### B.    Violations of the California False Claims Act (CFCA)

199.    This claim for violations of the California False Claims Act, Cal. Gov't Code §
12650, *et seq.*, is brought by Relator in the name of the State of California, pursuant to Gov't
Code § 12652(c). Relator is an "original source" of the information on which this claim is
based, as that term is defined in Gov't Code § 12652(d)(3)(C).

200.    Gov't Code § 12651(a) provides that:

> "Any person who commits any of the following enumerated acts
> in this subdivision shall have violated this article and shall be
> liable to the state or to the political subdivision for three times
> the amount of damages that the state or political subdivision
> sustains because of the act of that person. A person who commits
> any of the following enumerated acts shall also be liable to the
> state or to the political subdivision for the costs of a civil action
> brought to recover any of those penalties or damages, and shall
> be liable to the state or political subdivision for a civil penalty of
> not less than five thousand five hundred dollars ($5,500) and not
> more than eleven thousand dollars ($11,000) for each violation, as
> adjusted by the Federal Civil Penalties Inflation Adjustment Act
> of 1990 . . . ."

201.    Gov't Code § 12651(a)(1) provides that any person who "knowingly presents or
causes to be presented a false or fraudulent claim for payment or approval" is so liable.

202.    Gov't Code § 12650(b)(2) defines "knowingly" to "mean that a person, with
respect to information, does any of the following:

> (A)    Has    actual    knowledge    of    the    information.
>
> (B) Acts in deliberate ignorance of the truth or falsity of the
> information.
>
> (C) Acts in reckless disregard of the truth or falsity of the
> information.
>
> Proof of specific intent to defraud is not required.

203.    In relevant part, Gov't Code § 12650(b)(1) defines "claim" as:

> any request or demand, whether under a contract or otherwise,
> for money, property, or services, and whether or not the state or
> a political subdivision has title to the money, property, or services
> that meets either of the following conditions:
>
> > (A) Is presented to an officer, employee, or agent of the
> > state or of a political subdivision.

(B) Is made to a contractor, grantee, or other recipient, if the money, property, or service is to be spent or used on a state or any political subdivision's behalf or to advance a state or political subdivision's program or interest, and if the state or political subdivision meets either of the following conditions:

(i) Provides or has provided any portion of the money, property, or service requested or demanded; or

(ii) Reimburses the contractor, grantee, or other recipient for any portion of the money, property, or service that is requested or demanded.

204. The Medicaid claims submitted by Defendants to the California MMIS Fiscal Intermediary are "claims" within the meaning of the CFCA.

205. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval by regularly and freely upcoding and bundling for genetic panels in violation of Gov't Code § 12651(a)(1).

206. By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval for I tests which were not performed as such, in violation of Gov't Code § 12651(a)(1).

207. Gov't Code § 12651(a)(2) provides that any person who "knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim" is liable for the same treble damages and civil penalties.

208. Gov't Code § 12650(b)(4) defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money, property, or services."

209. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements material to the foregoing false or fraudulent claims, in violation of Gov't Code § 12651(a)(2). Specifically, Defendants knowingly submitted false or fraudulent claims using false CPT billing codes, which not only influenced, but determined, the amount they were paid.

210. The State, unaware of the falsity or fraudulence of the claims presented by Defendants, or the falsity of the records and/or statements which the Defendants made,

used, or caused doctors and other health care providers to make, and in reliance on the accuracy thereof, paid Defendants, doctors, and other health care providers for claims that would otherwise not have been allowed, suffering damages.

211.  Gov't Code § 12651(a)(7) imposes liability for the same treble damages and civil penalties on any person who

> Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the state or to any political subdivision, or knowingly conceals or knowingly and improperly avoids, or decreases an obligation to pay or transmit money or property to the state or to any political subdivision.

212.  Gov't Code § 12650(b)(5) defines "obligation" to include "an established duty, whether or not fixed, arising from an express or implied contractual . . . relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."

213.  By virtue of the acts described above, Defendants knowingly concealed and/or knowingly and improperly avoided an obligation to pay or transmit money to the State resulting from Defendants' retention of the foregoing overpayments, in violation of Gov't Code § 12651(a)(7).

214.  Gov't Code § 12651(a)(8) imposes liability for the same treble damages and civil penalties on any person who is a beneficiary of an inadvertent submission of a false claim, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

215.  By virtue of the acts described above, Defendants, to the extent they were beneficiaries of the inadvertent submission of false claims, were alerted by Relator to the falsity of the claims but failed to disclose the false claims to the State within a reasonable time thereafter, in violation of Gov't Code § 12651(a)(8). As a result of the above-described conduct, the State is entitled to civil penalties and treble damages as provided by Gov't Code § 12651(a).

216.   Gov't Code § 12651(a)(3) provides that any person who "conspires to commit" any of the foregoing violations is liable for the same civil penalties and treble damages. Defendants conspired to commit each the violations alleged, for which they are jointly and severally liable pursuant to Gov't Code § 12651(a)(c).

## C.    Violation of the Federal Anti-Kick Back Statute

217.   The Federal Anti-Kickback Statute (AKS) is a part of the Social Security Act, codified at 42 U.S.C. § 1320a-7b(b). The statute states:

"(b) Illegal remunerations
(1)Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
(A)to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B )to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both."

218. The AKS is specifically designed to address fraud and abuse in federal healthcare programs. Besides the AKS, the beneficiary inducement statute (42 U.S.C. §

1320a-7a(a)(5)) also may impose civil monetary penalties on physicians who offer remuneration to Medicare and Medicaid beneficiaries to influence them to use their services.

219. Under 42 U.S.C. § 1320a-7a, providers who pay or accept kickbacks also face Civil Monetary Penalties (CMPL) of up to $50,000 per kickback plus three times the amount of the remuneration.

## IX.    CLAIMS FOR RELIEF

### A.    <u>FIRST CLAIM:  Violation Of The Federal False Claims Act,  31 U.S.C. § 3279</u> By Plaintiff United States Against All Defendants and Does 1-10

220. Plaintiff repeats and re-alleges all the preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

221. By falsely certifying the accuracy, completeness, and compliance of their reimbursement claims with Medicare laws, regulations, and instructions for payment, Defendants knowingly submitted false or fraudulent claims. This action is in violation of 31 U.S.C. § 3729(a)(1) and 31 U.S.C.§ 3729(a)(1)(A).

222. Due to Defendants' false claims, CMS disbursed funds that would not have been paid if the falsity were known. Each false claim constitutes a separate violation of the FCA.

223. During the statutory period, Defendants violated the FCA in several ways. They submitted claims to CMS and its contractors for tests that did not meet Medicare coverage requirements and misrepresented them as meeting such requirements. They claimed tests were medically necessary when they were not and claimed that tests were not illegally induced through offers of remuneration, violating the AKS

224. Defendants knowingly submitted upcoded and unbundled claims for Pathology special stains under CPT codes 88312-88313, 88341-88344, among other codes, for numerous Medicare beneficiaries. This includes false special stain claims for Patient 1, 2, 3,

4 and 5 as outlined in Section VII. Defendants knew these tests were not covered by Medicare, yet they upcoded and unbundled claims for unjust enrichment.

225.  Under the FCA, "knowingly" is defined as having actual knowledge of the information or acting in deliberate ignorance or reckless disregard of the truth or falsity of the information. Defendants acted **"knowingly"** under 31 U.S.C. § 3729(b)(1) in the following ways:

(i) Defendants had actual knowledge of their billing practices. They were directly involved in using external labs and pathologists without proper disclosure and billing adjustments, and they deliberately and improperly billed the government globally for services performed by external labs at marked-up prices (pass-through billing.)

(ii) They acted in deliberate ignorance of the truth by claiming that two pathologists read each slide while billing for only one reading. They contracted with independent pathologists, sent slides offsite for reading, and failed to correctly reflect the true rendering provider on claims.

(iii) Defendants acted in reckless disregard of the truth when they named a generic purported "ordering doctor" for most special stains, knowing that some of these named pathologists never read the slides for which they were billed.

(iv) Defendant Okuniewski represented to the Relator's principal that Sterling *always has two pathologists review and read each slide "at no extra charge,"* despite evidence demonstrating otherwise. He also misrepresented that Sterling's special stain rate was "under 10%", and conformed to national standards, despite mountains of evidence showing Sterling's special stain order rate far exceeded 10% (was 100%- 220%.)  These misrepresentations demonstrate actual knowledge of the information related to Defendants' fraudulent billing practices.

(v) Sterling routinely added a special stain result and bill to each report read by outside pathologists who never used or ordered such stains, further demonstrating deliberate ignorance of the truth or falsity of the information when billing the government for these services.

(vi) The government required that outside services not be marked up when the referring lab bills for technical services performed by the reference lab. Yet, Defendants knowingly disregarded this requirement by billing the government globally for lab services at marked-up prices.

(vii) Defendants failed to comply with government regulations that require them to correctly identify and bill using the reading pathologist's NPI and attach modifier 90 on their healthcare lab claims performed by reference laboratories. This shows a reckless disregard for the truth or falsity of the information in their billing practices.

(viii) Elite Medical Billing Corporation managed by Jenny Chang, knowingly and actively participated in the fraudulent billing practices by submitting false claims to Medicare and Medicaid, Tricare, the CARES Act, and the HRSA COVID-19 Uninsured Program on behalf of Sterling. Elite's involvement in submitting these false claims shows actual knowledge of the fraudulent information.

(ix) Chang, as the manager of Elite, was responsible for overseeing the billing practices and ensuring compliance with government regulations. Her position within the company indicates that she either had actual knowledge of the false information or acted in deliberate ignorance of the truth or falsity of the information related to the fraudulent billing practices.

(x) Elite and Chang facilitated the submission of false claims for unnecessary laboratory tests, including special stain Pathology tissue services and COVID-19 testing, by engaging in upcoding, unbundling, and using contracted cappers, runners,

and kickbacks to obtain patients' insurance information for unearned COVID-19 CARES Act payments. This demonstrates a reckless disregard for the truth or falsity of the information in their billing practices.

226.  Defendants' actions satisfy the definition of "knowingly" under 31 U.S.C. § 3729(b)(1). There is no need to prove specific intent to defraud.

227.  As a result of the false claims knowingly submitted by Defendants, the United States suffered substantial damages in excess of $35 million, the final amount to be determined at trial.

228.  In summary, Defendants knowingly submitted false claims to CMS, acted in deliberate ignorance and reckless disregard of the truth, and misrepresented their compliance with Medicare laws, regulations, and instructions for payment. These actions led to disbursements that would not have been made had the falsity been known, causing significant damages. Each of these actions violates the False Claims Act.

229.  Defendants knowingly engaged in improper billing practices as defined under 31 U.S.C. § 3729(b)(1), without needing to prove specific intent to defraud.

230.  Due to the false claims knowingly submitted by Defendants, the United States suffered substantial damages in excess of $35 million, the final amount to be determined at trial.

**B.    SECOND CLAIM : Violation Of The California False Claims Act, Cal. Govt Code. §12650-12652**
By Plaintiff State of California Against All Defendants and Does 1-10

231.  Plaintiff repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

232.  Defendants violated the California False Claims Act (CFCA) for Medi-Cal (Cal. Gov't Code §§ 12650-12656).

233. Defendants submitted non-compliant claims to the State, misrepresented tests as medically necessary, and unlawfully induced tests through offers of remuneration, violating the AKS.

234. Medi-Cal and Medicaid, funded by federal and state sources, were defrauded by Defendants' actions.

235. The State seeks treble damages, penalties, and costs under CFCA. Cal. Govt. Code §12651 subd. (a)(1).

236. Defendants knowingly submitted or caused to be presented to Medicaid false or fraudulent claims for payment or approval for payment, including but not limited to the exemplar false claims identified in Section VII of this Complaint. Defendants' conduct was a substantial factor in causing the false claims to be presented. Defendants provided their knowing misrepresentations for the purpose of obtaining government payments to which they knew or should have known they were not entitled under proper payment rules for laboratory and special stain claims. This knowledge was demonstrated as follows:

(i) Defendants had actual knowledge of their billing practices, as they were directly involved in using external labs and pathologists without proper disclosure and billing adjustments. They also deliberately and improperly billed the government globally for services performed by external labs at marked-up prices (pass-through billing).

(ii) Defendants acted in deliberate ignorance of the truth or falsity of the information by claiming that two pathologists read each slide while billing for only one reading. They contracted with independent pathologists, sent slides offsite for reading, and failed to correctly reflect the true rendering provider on claims, as was otherwise required.

(iii) Defendants acted in reckless disregard of the truth or falsity of the information when they named a generic purported "ordering doctor" for most

special stains, knowing that some of these named pathologists never rendered services or read the slides they billed for.

(iv) Defendants failed to comply with government regulations that require them to correctly identify and bill using the reading pathologist's NPI and attach modifier 90 on their healthcare lab claims performed by reference laboratories. This shows a reckless disregard for the truth or falsity of the information in their billing practices.

237.   Defendants' misrepresentations had a natural tendency to influence or were capable of influencing the State's decisions to remit payments on the false claims at issue in this action, and to make remittances to Defendants on claims which violated the CFCA, including but not limited to the claims identified in Section VII.

238.   By the same acts, Defendants knowingly made false records or statements to get fraudulent claims paid by the State. Cal. Govt. Code §12651 subd. (a)(2).

239.   Defendants' misleading records or statements influenced the State's payment decisions for false claims.

240.   Defendants submitted non-compliant and medically unnecessary tests to Medi-Cal and Medicaid, using false documents to present them as compliant.

241.   For each claim, including those for patients in Section VII of this Complaint, Defendants knowingly assisted in or conspired to present false or misleading information in support of a claim for payment, violating CFCA.

242.   As a result of Defendants' actions, the State suffered damages in excess of $4.8 million, the specific amount to be determined at trial. The State has been substantially damaged by Defendants' false statements.

**C.    THIRD CLAIM : Violation Of The Anti-Kickback Statute, 42 U.S.C. § 1320A-7B(B)**
By Plaintiff United States Against All Defendants and Does 1-10

243.  Plaintiff repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

244.  Defendants knowingly and willfully violated the Anti-Kickback Statute (AKS) codified by 42 U.S.C. § 1320A-7B(B) by offering and paying remuneration, including kickbacks, to induce referrals for laboratory testing from federal healthcare programs.

245.  The AKS states: "Whoever knowingly and willfully offers or pays any remuneration...to any person to induce such person to purchase...any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony....42 U.S.C. § 1320a-7b(b)(2)(8)."

246.  In 2020, Sterling initiated a fraudulent scheme involving COVID-19 test overbilling. This scheme resulted in illicitly obtained revenues exceeding tens of millions of dollars, primarily from government funds, including the CARES Act and HRSA COVID-19 Uninsured Program allocations.

247.  Defendants Sterling, Elite, and Chang capitalized on the COVID-19 pandemic, generating significant revenue through illegal marketing practices, including the payment of over $1.2 million in kickbacks to patient recruiters conditioned on steering patients and securing "clean claims" paid under the CARES Act.

248.  From  mid-2020 through February 2023, Sterling contracted with a large number of third-party independent runners, cappers, and agents to solicit, procure, and refer specimens for Sterling's COVID-19 scheme, including Company 1, a *fabric company* to act as Sterling's "Agent" to "provide nasal specimen collection services for COVID testing." Sterling paid these unqualified agents for performance and expressly conditioned its payments on the contractual obligation that "*the specimens were properly documented by Agent, Sterling  submitted billing to insurance payers and to the HRSA COVID-19 Uninsured Program and the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) for specimen services.*"

249.  Defendants entered into numerous illicit referral agreements, several labeled as "Lab Services Agreements" (LSA). These agreements, both written and verbal, involved

third-party patient recruiters who agreed to steer patients to Sterling and provide patient demographic information, including copies of insurance cards and driver's licenses, in exchange for payments ranging from $18 to $39 for each referral leading to a "clean claim" submitted to the government. Notably, Defendants misrepresented the fair market value for specimen collection services in their contracts, stating a range of $18-$21, which aligns more closely with industry standards. However, in practice, they incurred or paid $35- $39 per specimen, a sum significantly above fair market value, thus indicating their intent to incentivize referrals rather than simply pay for services rendered. This discrepancy further substantiates the allegation that these payments were indeed kickbacks intended to induce referrals, rather than legitimate compensation for services.

250.  Defendants knowingly and willfully paid more than fair market value for COVID-19 specimen collection. They actually incurred and paid $35-$39 per specimen, but concealed this amount by writing in their LSA contracts **(Exhibits A and B)** that they would pay $18-$21 per specimen. Further, Defendants conspired with individual 1 and Company 1 and Individual 2 and Company 2 to conceal the kickback fees they paid. This is a violation of the False Claims Act, which prohibits knowingly and willfully submitting false claims to the government.

251.  These illicit practices induced even healthy individuals to undergo unnecessary tests. The costs of these unnecessary tests were then fraudulently passed on to Medicare and other government-funded healthcare programs, including the CARES Act and HRSA COVID-19 Uninsured Program.

252.  Defendants' actions constitute a violation of the AKS, 42 U.S.C. § 1320A-7B(B), as they offered, solicited, and paid kickbacks to induce referrals for laboratory testing from federal healthcare programs, leading to an increase in unnecessary tests and false claims, thereby causing substantial financial damage to the United States.

253.  On information and belief, Defendants further exploited the patient information obtained through these illicit practices by fraudulently billing for additional tests and procedures not supported by diagnosis codes or eligible for reimbursement, as well

as multiple and repeat claims for the same services on the same patients- tests which were not performed.

**Discounts and "Perks"**

254.  Defendants engaged in unlawful practices by offering and providing prohibited forms of remuneration in the form of discounts and "perks." Specifically, the Defendants routinely reduced or waived coinsurance and deductible amounts for patients, a practice explicitly excluded from the discount safe harbor under 42 C.F.R. § 1001.952(h)(5)(iii) and (iv).

255.  Defendants did not report these reductions or waivers to Medicare, Medicaid, or other Federal health care programs, and continued to bill the government at the full rate for tests, in violation of 42 C.F.R. § 414.21.

256.  In order to induce patients to submit to their tests, Defendants, including Elite and Chang, routinely offered to reduce or waive government beneficiaries' co-pays and deductibles.

257.  Defendants used these reductions and waivers to encourage patients to undergo tests and to discourage them from filing complaints or reporting Sterling's upcoding to the government.

258.  Furthermore, Defendants routinely offered "perks" to community physicians and providers, such as free meals, sponsorships, uncompensated services, and other remuneration, in exchange for access and to promote overutilization of Sterling's lab services and self-ordering of special stains tests for their patients.

259.  As a direct result of these unlawful schemes, Defendants induced providers to order tests and patients to undergo tests that they would not have otherwise ordered or submitted to, and further discouraged them from reporting Defendants to the government.

**Company 1**

260.  On or around September 16, 2021, Defendants Sterling, Yang, and Okuniewski conspired with Company 1, pursuant to a "Laboratory Services Agreement" (LSA), to unlawfully collect and exploit insurance and identification details for fraudulent

government billing, largely targeting immigrant communities in Los Angeles and surrounding areas, as evidenced in **Exhibit "A."**

261.   Defendants directed Company 1 to obtain as many insurance cards and drivers' licenses as possible, with the aim of maximizing Sterling's fraudulent billings, irrespective of whether the billed tests were performed.

262.   Sterling and Okuniewski, intending to defraud the government, instructed Company 1 to collect insurance and identification details for fraudulent billing under the CARES Act and the HRSA COVID-19 Uninsured Program, compensating Company 1 on a per claim basis, ranging from $18 to $39.

263.   The LSA obligated Company 1 to provide Sterling with personal demographic information and copies of primary insurance details, as required for "clean claim" billing.

264.   For each patient recruited by Company 1, Sterling incurred fees ranging from $18 to $21. Despite the explicit terms of the written LSA, Sterling verbally agreed to reimburse Company 1 at a higher rate, while simultaneously professing a desire to avoid violations of Stark Law and the federal Medicare/Medicaid Anti-Kickback Law.

265.   On or around May 18, 2022, Company 1 and Sterling executed a "Services Payment Agreement," in which Sterling committed to an additional payment of $171,752.00 for Company 1's services, as per **Exhibit "B."**

<u>**Company 2**</u>

266.   Similarly, on or around January 15, 2021, Defendants Sterling, Yang, and Okuniewski conspired with Individual 2 and Company 2, to unlawfully collect and exploit identification and insurance details for fraudulent government billing, predominantly targeting immigrant communities in California.

267.   Between January and December 2021, Company 2 collected over 13,000 patient demographics and billing information for Sterling's fraudulent testing scheme. Each fraudulent "clean claim" incurred fees of $39 to Company 2, with no written agreement due to the Defendants' concerns about violating the Anti-Kickback Statute (AKS).

268.  Sterling remunerated Individual 2 or Company 2 with $276,235.71 for their services in recruiting patients and facilitating fraudulent laboratory billing, thus inducing referrals to federal and state healthcare programs.

**Defendants Violated the Anti-Kickback Statute in Soliciting and Inducing Orders for Lab Services**

269.  From in or around May 2020 and continuing through March 2023 in the jurisdiction of this Court, Defendants and Does 1-10 knowingly and willfully conspired and agreed with third parties including Company 1, Company 2, Individual 1, Individual 2, and others to commit offenses against the government to violate as follows:

a) Title 42, United States Code, Section 1320a- 7b(b)(l)(A), by soliciting and receiving any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program; and to violate

b) Title 42, United States Code, Section 1320a- 7b(b)(2)(A), by offering and paying any remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, *to* any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program.

270.  It was the **goal** of the conspiracy for Defendants Yang, Okuniewski, Lekov, Sterling, and their co-conspirators to unlawfully enrich themselves by, among other things, soliciting, receiving, offering, and paying kickbacks and bribes in return for recruiting and referring Medicare and Medicaid beneficiaries to Sterling for diagnostic testing, including COVID-19 testing.

271. The **manner and means** by which Defendants Yang, Okuniewski, Lekov, Sterling and their co-conspirators sought to accomplish the goal of the conspiracy included, among other things, the following:

a) Defendants Yang, Okuniewski, and Sterling agreed to and did offer and pay illegal kickbacks and bribes to Company 1 and/or Individual 1 and Company 2 and/or Individual 2 in exchange for signed requisition forms and/or specimens that were sent to Sterling and Elite for the purpose of performing tests that were billed to Medicare and Medicaid, and the government under the CARES Act and HRSA COVID-19 Uninsured Program.

b) Defendants Yang, Okuniewski, and Sterling agreed to and did pay Company 1 and/or Individual 1 and Company 2 and/or Individual 2 a percentage of the Medicare and Medicaid reimbursement for specimens and signed requisition forms that Company 1 and Company 2 referred to Sterling.

c) Individual 1 and Individual 2 worked together to generate referrals for COVID-19 testing targeting immigrant communities in California. Specifically, Individual 1, and Individual 2 in large part dispatched Chinese speaking agents to set up booths to persuade immigrant Medicare and Medicaid beneficiaries to submit to laboratory testing, including COVID-19 testing, by providing their driver's license and insurance information. Defendants and Does 1-10 signed the electronic claims and testing requisition forms generated by Individual 1 and Individual 2 through their community dispatchers and submitted these to the government for payment.

d) To disguise the scheme, Defendants Yang, Okuniewski, Sterling, Elite, Chang, Individual 1, and Individual 2 created sham documentation, including "LSA" and ledgers, to conceal and disguise the illegal kickbacks and bribes paid by Defendants in exchange for signed requisition forms and specimen referrals.

272. In **furtherance of the conspiracy** and to accomplish their goals, Defendants their co-conspirators committed, and caused to be committed, the following acts in California and elsewhere:

a) From on or about January 6, 2022 to January 4, 2023, Defendants Yang, Okuniewski, and Sterling wrote multiple checks in amounts totaling $276,235.71

payable to Company 2 and/or Individual 2 and drawn on the Sterling bank account, in exchange for specimens and requisitions referred by Company 2.

b) On or about November 8, 2022, Defendants Yang, Okuniewski, and Sterling wrote checks in amounts totaling approximate $129,000, payable to Company 1 and/or Individual 1, and drawn on the Sterling bank account, in exchange for specimens and requisition forms referred by Company 1 and Individual 1.

273.   Sterling's illicit marketing  scheme to recruit patients (specimens) for largely unnecessary laboratory tests between late 2020 to early 2023 was wildly profitable and successful. At the relevant times, Sterling collected roughly $100-$200 per specimen from the Government, while *incurring* fees to cappers of $18-$39 per recruited and procured patient and sharing approximately 5-6% commission on its gross collections to Elite and Chang.

274. Defendants Yang, Okuniewski, and Sterling incurred or paid Individual 1 and/or Company 1 and Individual 2 and/or Company 2 approximately $550,000 in exchange for diagnostic testing referrals, including COVID-19 testing and other laboratory  referrals, that they caused to be referred to Sterling.

275.   Furthermore, Defendants offered and paid cash or cash equivalents to runners, cappers, and health care providers to induce orders for their tests, or to allow Defendants access to independent third-party information collectors to bill for  eligible government beneficiaries.

276.   Sterling represented a capacity for performing "33,000" COVID tests per week, all of which were compensated either by Medicare, Medicaid, or the government through the CARES Act and the HRSA COVID-19 Uninsured Program.

277.   Defendants and others, through Sterling, submitted or caused the submission of approximately $75,000,000 in claims to Medicare, Medicaid, the CARES Act, and the HRSA COVID-19 Uninsured Program, including claims for beneficiaries residing in **King County**, which resulted in reimbursement for laboratory tests that were generated procured by the payment of kickbacks and bribes.

1

2  **D.    FOURTH CLAIM : Making Or Using False Record Or Statement To**
**Cause Federal False Claim To Be Paid**

3      By Plaintiff United States Against All Defendants and Does 1-10

4

5      278.  Plaintiff repeats and re-alleges all preceding paragraphs of the Complaint

6  inclusive, as if fully set forth herein.

7      279.  Throughout the statutory period, Defendants knowingly made, used, or caused

8  to be made or used, false records or statements material to false or fraudulent claims,

9  contrary to 31 U.S.C. § 3729(a)(1)(B). Specifically, Defendants knowingly created or utilized

10 false documentation asserting that their tests complied with coverage requirements when

11 submitting claims for payment to the government.

12     280.  The specific conduct of the Defendants was material to the government's

13 decision to pay these claims. The submission of these false records or statements induced

14 the Centers for Medicare & Medicaid Services (CMS) to disburse funds that it would not

15 have paid had it known the truth about Defendants' non-compliance with coverage

16 requirements. Each submission of a false record or statement is a separate violation of the

17 FCA.

18     281.  Defendants used these false records and statements to secure unlawful

19 payments for numerous beneficiaries, including but not limited to Patients 1,2,3,4, and 5 as

20 outlined in Section VII.

21     282.  By reason of the false or fraudulent records or statements that Defendants

22 knowingly made or used, the United States suffered significant financial harm, the precise

23 amount of which will be proven at trial. This harm is directly attributable to the Defendants'

24 violations of 31 U.S.C. § 3729(a)(1)(B).

25

26 **E.    FIFTH CLAIM :  Conspiring To Submit Federal False Claims**
      By Plaintiff United States Against All Defendants and Does 1-10

27

28

283.  Plaintiff repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

284.  As set forth above, Defendants' and Does 1-10's directors, managing  agents, and other employees conspired with each other and unnamed parties to seek and obtain payments by submitting claims based on fraudulent representations and records.

285.  Yang, Okuniewski, and Sterling conspired to boost Sterling's revenues through upcoding and unbundling schemes. They charged one or more special stain codes for every specimen processed, intending to double or triple Sterling's per specimen revenues

286.  Drs. Yang and Lekov agreed to employ "generic" physician names on Pathology reports and  to  self-order and bill unnecessary special stains codes for each specimen processed at Sterling, generating false and fraudulent Pathology reports to defraud the government.

287.  Yang and Okuniewski, agreed to execute  institutional wide upcoding policies whereby special stains were pre-ordered for all or nearly all Pathology specimens submitted to Sterling. As an overt act in furtherance of their conspiracy to defraud health carriers, the conspirators developed reflex algorithms whereby specimens would have "special stains" attached, thereby all conspirators stood to substantially benefit from their unlawful acts.

288.  Yang, Okuniewski, and Lekov then agreed to implement institutional wide policies whereby special stains were ordered for all or nearly all Pathology specimens submitted to Sterling. Thus, when Yang was unavailable or out of town, Lekov would sign or authorize the transcriptionist to stamp her signature on fraudulent Pathology reports with phantom "special stains" which were typically not even performed.

289.  Yang, Okuniewski, and Lekov also entered into an agreement with their fellow in training Dr. Kimberly Woodward to also assist Sterling and  agreed to perform and adhere to Sterling's special stain scheme.

290.  Sterling, Yang, Okuniewski, and Lekov entered into an agreement among themselves, implementing a purported  policy that "2 pathologists would view each case…"

and one pathologist either Yang or Lekov primarily would sign the reports where Defendants caused to have false and fraudulent charges for "special stains".

291.  Yang, Lekov, Okuniewski, and Sterling conspired with Elite, Chang, and Does 1-10 to bill the government for false special stain codes based on fabricated Pathology reports. All co-conspirators agreed to collect and retain government funds for services that did not meet the billing requirements for laboratory services. Defendants verbally directed their employees to electronically transit the false claims or in some cases mail the false claim forms to the government for payments.

292.  Elite Medical Billing Corporation and Jenny Chang agreed with Defendants to enter the false claims, process upcoded entries, and  electronically transmit false remittances for government payment.  In exchange for  their role in Sterling's fraud, Elite and Chang retained 5-6% of gross collections from Sterling's unlawful billing.

293.  As a result of their conspiracy, Sterling, Yang, Lekov, and Okuniewski caused to be submitted false and fraudulent special stains claims, which they knew were neither reasonable nor necessary. Defendants' scheme has evaded government detection, resulting in severe damages to the government and taxpayers.  The conduct is also ongoing.

294.  From at least 2012 onward, all co-conspirators caused the submission of hundreds of thousands of false laboratory claims to the government in furtherance of their conspiracy.

295.  Accordingly, Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of 31 U.S.C. § 3729(a)(3) (1986) and conspired to commit violations of 31 U.S.C. §§ 3729(a)( I )(A) and 3729(a)( I )(B), in violation of 31 U.S.C. § 3729(a)( I )(C) (2009).

296.  By reason of the false or fraudulent claims that Defendant conspired to get allowed or paid, or by reason of its conspiracy to violate 31 U.S.C. §§ 3729(a)(I )(A) and 3729(a)(I)(B), the United States has been damaged in a substantial amount, to be proven at trial.

1

2    **F.    SIXTH CLAIM : Improperly Avoiding An Obligation To Pay Or
     Transmit Money To The Government**

3            By Plaintiff United States Against All Defendants and Does 1-10

4

5        297.   Plaintiff repeats and re-alleges all preceding paragraphs of the Complaint

6    inclusive, as if fully set forth herein.

7        298.   Under 42 U.S.C. I 320a-7k(d), Defendants were obligated to report and return

8    each overpayment to the MAC. They were also required to notify the MAC in writing of the

9    reason for the overpayment "by the later of (A) ... 60 days after the date on which the

10   overpayment was identified; or (8) the date any corresponding cost report is due."

11       299.   Under 42 C.F.R. § 401.305(a}(2) "A person has identified an overpayment when

12   the person has, or should have through the exercise of reasonable diligence, determined that

13   the person has received an overpayment and quantified the amount of the overpayment."

14       300.   Defendants knew or had reason to know that they had been overpaid by

15   Medicare and Medicaid  for tests that did not meet the requirements for reimbursement

16   under Medicare's LCD. Further, Defendants were on notice of these overpayments as soon

17   as other carriers and Medicare either denied their claims or started seeking refunds.

18       301.   Nevertheless, Defendants continued to systematically and aggressively submit

19   claims  and receive payment from CMS for claims that did not meet LCD requirements.

20       302.   As a result of the fraud described herein, Defendants have received

21   overpayments from the MAC which Defendants failed to return. Each failure to comply with

22   the obligations of 42 U.S.C. 1320a-7k(d) is a separate violation of 31 U.S.C. § 3729(a)(l)(G).

23       303.   By reason of Defendants' violations of 31 U.S.C. § 3729(a)(l)(O), the United

24   States has been damaged in a substantial amount, to be proven at trial.

25

26   **G.    SEVENTH CLAIM:  Unjust Enrichment**
     By Plaintiffs United States and the State of California Against All Defendants and Does 1-10

27

28

304. Plaintiffs repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

305. Defendants unjustly received and retained payments from the United States and California, based on fraudulently submitted claims using fraudulent records. Given the circumstances surrounding Defendants' receipt of these funds, it would be inequitable and unconscionable to allow Defendants to retain such monies. The precise amount of these funds will be determined at trial.

306. Sterling claimed a capacity for performing "33,000" COVID tests per week, all compensated by Medicare, Medicaid, or the government through the CARES Act and the HRSA COVID-19 Uninsured Program.

307. During 2021 and 2022, Sterling caused to be collected more COVID-19 samples than they could test due to their illicit marketing and recruitment practices. Despite lacking the resources required to timely or adequately process these specimens, Sterling continued to collect samples. Consequently, Sterling was unable to process numerous specimens and failed to provide results, despite billing the government for all collected samples, regardless of whether they were tested.

308. Knowing the potential for the discovery of their fraudulent activities, especially during the COVID-19 pandemic, Defendants proactively orchestrated a complex network of shell companies, corporate entities, bank accounts, and foreign trusts and investments to distribute, divert, and conceal their ill-gotten gains. This scheme was designed to hide the tens of millions of dollars obtained from the government through their deceptive laboratory billing practices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and Relator pray for judgment against Defendants as follows:

(1) That Defendants cease and desist from Violating 31 U.S.C. §3279 and California Government Code § 12650-12656;

1

2    (2) That the Court enter Judgment against Defendants and in favor of the United

3    States pursuant to 31 U.S.C. § 3729 *et seq.* in an amount equal to three times the

4    amount of damages the United States has sustained as a result of Defendants'

5    actions, plus the prevailing maximum civil penalty of $27,018[8] for each violation

6    of the False Claims Act;

7

8    (3) That as to all Claims for Relief, the Court enter an award for Relator for the

9    maximum award permitted under 31 U.S.C. § 3730(d);

10

11   (4) That the Court enter Judgment against Defendants and in favor of the State of

12   California pursuant to Cal. Government Code Section 12651 subdivision (a),

13   three times the damages which the State sustained as a result of Defendants'

14   false claims, plus the prevailing civil penalty of $11,000 for each violation of the

15   California False Claims Act;

16

17   (5) That as to all Claims for the State, pursuant to Government Code § 12652(g)(3)

18   the Relator be awarded no less than 25% and no more than 50% of the State's

19   proceeds;

20

21   (6) That the Court award to the United States, California, and to Relator for costs of

22   court, including costs of investigation, and for pre- and post-judgment interest at

23   the rates permitted by law;

24

25

26

27

28

---

[8] Annual inflationary adjustments to the FCA's civil monetary penalties are set by statute and the prevailing rate increases annually.

(7) That the Court enter an award for Relator's reasonable attorneys' fees, expenses, and costs of suit, incurred in prosecuting this action pursuant to 31 U.S.C. § 3730(d) and Cal. Gov't Code § 12652(g)(8);

(8) That by reason of Defendants' unjust enrichment, the Court enter an order requiring Defendants to disclose and disgorge all monies they received as a result of the illicit scheme described herein including those in foreign accounts; and

(9) That the United States, The State, and Relator recover all such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the federal rule of Civil procedure, Plaintiffs and Relator demand a trial by jury on all claims so triable.

Respectfully submitted,

Dated:  April 24, 2023                    \s\ *Gloria Juarez*
                                          Gloria Morin Juarez, CA SBN 109115
                                          **LAW OFFICES OF GLORIA JUAREZ**
                                          28202 Cabot Road, Suite 300
                                          Laguna Niguel, CA 92677
                                          Tel: 949-288-3042
                                          Email: gloria@thegjlaw.com
                                          ATTORNEYS FOR RELATOR AMERICAN
                                          INTEGRA LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, I caused a true copy of the Complaint in the matter captioned **UNITED STATES OF AMERICA AND CALIFORNIA EX REL. AMERICAN INTEGRA V. STERLING PATHOLOGY MEDICAL CORPORATION ET. AL** to be served upon the following,

Person(s) and/or Entity(s) to whom mailed:
**By Certified U.S. Mail**

Attorney General of the United States
950 Pennsylvania Avenue, Northwest
Washington, DC 20530-0001

**By U.S. Mail**

Civil Process Clerk
United States Attorney's Office for the
Eastern District of California
501 I St Ste 10-100
Sacramento, CA 95814

**By Electronic Mail**

Colleen M. Kennedy
Chief, US Attorney's Office
Affirmative Civil Enforcement Unit
Eastern District of California
501 I St Ste 10-100
Sacramento, CA 95814
Tel.: 916-554-2826
Email: colleen.m.kennedy@usdoj.gov

Jennifer S. Gregory
Deputy Attorney General  California Department of Justice
Division of Medi-Cal Fraud and Elder Abuse, Civil Section
2329 Gateway Oaks Drive,  Suite 200
Sacramento, California 95833
Tel.: 916.621.1823
Email: Jennifer.Gregory@doj.ca.gov

Office of the Attorney General
California Department of Justice
Supervising Deputy Attorney General
Division of Medi-Cal Fraud and Elder Abuse
1300 "I" Street
Sacramento, CA 95814-2919
Phone: (916) 445-9555
E-mail:  AGelectronicservice@doj.ca.gov


Todd Spitzer
Orange County District Attorney
300 N. Flower Street, Santa Ana, CA 92702-0808
Phone: (714)347-8401
Email: todd.spitzer@da.ocgov.com


*S/GJuarez*
Gloria M. Juarez